THE EVANSVILLE AND CRAWFORDSVILLE R. R. Co. v. SNAPP.

RAILROAD.—*Killing Stock.*—*Appearance.*—*Evidence.*—*Supreme Court.*—In an action against a railroad company, under the statute, for killing stock, in

running and operating a railroad alleged to belong to the defendant, where, though there is no evidence given as to the ownership of such railroad, there is no evidence to the contrary, yet if the defendant appear and contest the cause. the Supreme Court, on appeal, will not set aside a verdict for the plaintiff, on account of the mere absence of such affirmative evidence.

SAME.— *Verdict.*—.*Weight of Evidence.*—The Supreme Court, on appeal, will not set aside the verdict of a jury merely because the evidence is conflicting, if any of it tends to sustain the verdict.

From the Knox Circuit Court.

*F. W. Viehe* and *R. G. Evans,* for appellant.

*G. G. Reily* and *W. C. Johnson,* for appellee.

Howk, J.—In this action, the appellee, as plaintiff, sued the appellant, as defendant, before a justice of the peace of Knox county.

In his complaint, the appellee alleged, in substance, that, on the 3d day of July, 1875, he was the owner of one gray mare, of the value of eighty dollars; that, on said day, the appellant was the owner of and operating a railroad in said county; that, upon said day, the appellee's mare, at a point in said county, entered upon said railroad where the same was not securely fenced in; and the appellant then and there, by its cars and locomotive, ran against and upon said mare, thereby killing the same, to the appellee's damages one hundred dollars. Wherefore, etc.

The trial before the justice resulted in a finding and judgment in favor of the appellee, for seventy-five dollars, from which judgment an appeal was duly taken to the court below.

In this latter court the cause was tried by a jury, and a verdict was returned for the appellee, assessing his damages in the sum of eighty-six dollars and seventy-five cents. The appellant's motion for a new trial having been overruled, and its exception saved to this decision, judgment was rendered on the verdict.

The only alleged error, complained of by the appellant in this court, is the overruling of its motion for a new

trial. The causes assigned for such new trial were as follows:

"1. The verdict of the jury is not sustained by sufficient evidence; and,

"2. The verdict of the jury is contrary to the evidence."

The only questions discussed by the appellant's learned attorneys in their argument of this cause in this court relate to the sufficiency of the evidence adduced upon the trial to sustain some of the material averments of the appellee's complaint. It is necessary, we think, to the proper understanding of those questions, and of our decisions thereof, that we should set out, in this opinion, all the evidence on the trial, which we now do, as follows:

Reason Sproatt, a witness for appellee, testified: "I knew both horses that were killed. Beard owned the black horse, and J. R. Snapp owned the gray mare. They both ran in Snapp's pasture. The pasture was situated on the east side of the railroad. The fence was down, over one hundred yards, between the pasture and railroad. In the Spring, the water came up, and the wind blew the fence down. The horses were killed on the evening of July 3d, 1874, about 8 o'clock, I think, by the passenger train going north. I saw the horses the day after they were killed. The section boss of the railroad got me to go and look at them; one was lying on the east side, and one was lying on the west side, of the road. I saw tracks coming from direction where fence was down, but did not notice where they got through. The horse was worth about $75, and the mare was worth about $75. It was on the Evansville and Crawfordsville Railroad, and in Knox county, Indiana, where the horses were killed.'

On cross-examination, the witness testified: "I don't know where the horses got through the fence."

James Snapp, a witness for appellee, testified: "The plaintiff, Snapp, and Beard owned the horses that were

killed. Snapp owned the gray, and Beard owned the black. They were worth about $75 each. I went there after the horses were killed; they were lying on each side of railroad, and were killed 25 or 30 steps from where they entered. The fence was a fence separating the pasture from the road; the fence had been down for two or three months. There was a pond all along on each side of the fence, where it was down. I traced the horses to the water through the sand, at a point where the fence was down; could see where they went in and came out; could not track them through the water; the water was about a foot and a half deep. The animals were bruised and bloody, where they had been struck by the train; there was also blood and hair on the track opposite where they lay, and there were fresh tracks of horses leading from the pond up to the track at the point."

On cross-examination, this witness said: "The pond where I tracked the horses to was a watering-place for the stock in the pasture; the horses always went there for water."

Ransom Snapp, a witness for appellee, testified: "I knew the horses that were killed; they were in the pasture next to the railroad; saw them the morning after they were killed. I tracked them from where the fence was down to where they were killed; saw tracks in the water. The fence was down two or three months before they were killed. The horses were worth about $75 each. The pasture fence was joined onto the railroad fence, and the railroad fence had been used as a division fence between the two, the railroad and pasture, for some eight or ten years. I am a nephew of plaintiff, James R. Snapp. James Snapp is my brother."

Here the appellee rested.

William Mohring, a witness for the appellant, testified: "I was a section boss on the Evansville and Crawfordsville railroad at the time the horses were killed. They were killed this side of Griswold station. I went there

to see about the horses being killed; the Snapp boys were there. No part of the fence was down, but, where the horses jumped over, a board was off the fence; they knocked it off in getting over. It was a good fence, five planks high; the boards were good, wide boards. I tracked the horses where they came to the fence, and where they jumped over; could see the tracks on each side. They had been jumping over the fence before; had driven them out many times. The ground was soft, and I could track them easily. I saw where they jumped over; they broke the board off. The horses were left there, so that everybody could see that the fence was not down. John Racy and Daniel Killinger were there. The fence fell down in the water afterward. The horses got over on one side of the pond, and I traced them past the pond to the place where they were killed. The horses were killed in March, and not in July. I was not section boss in July, but was in Vincennes. I went after Sproatt to come and see the horses."

On cross-examination, this witness said: "The horses had knocked plank off before, and we had nailed them over; in the latter part of June, James R. Snapp put the fence up."

John Racy, a witness for the appellant, testified: "I was working on a section of the E. & C. Railroad at the time the horses in controversy were killed; I can't tell just exactly the time when the horses were killed; they jumped the fence, and got in on the track that way; they jumped over, about three panels above the water; they had knocked a plank off in jumping over; we could see where they jumped over; we could see the tracks on both sides of the fence; they were fresh tracks; we traced them from where they jumped over, past the pond, to where they were killed; we had run the gray out many times; he had been a great bother to us; the fence was used for a partition fence for both the railroad and the pasture; the fence in the pond had been and was leaning,

but was not down; I did not consider either of the horses. a black horse; been raised with horses all my life, and know a gray horse from a black horse; I would call the one they call black an iron-gray."

On cross-examination, the witness said: "The fence was never clear down in the water; the gray had been jumping the fence above the water for some time."

Daniel Killinger, a witness for appellant, testified: "I was a workman on the section, under Mr. Mohring, at the time the horses in controversy were killed; I am now working on construction train on the road; I think the horses were killed in July, of 1874; Mohring and Racy were with me when I first saw them; they were lying above the track; we followed the tracks; they jumped over, about two or three panels above where they were killed; they broke one board in jumping over the fence; was an ordinary five-plank fence; it was never entirely down in the water; it was only leaning over."

On cross-examination the witness said: "Some of the plank were loose; this plank where the horses got over was broken off at the end, and had fallen to the ground; they broke it in jumping over; the board was sound."

Reason Sproatt, a witness for appellant, testified: "Mr. Mohring was with me when I saw the horses; it was the only time we were ever there together; Mohring showed me where the horses got over, but I did not go to see."

Here the appellant rested

In rebuttal, Toussaint Beard, a witness for appellee, testified: "I sent my horse over to Snapp's pasture, about the last of April, 1874; my horse was not breachy, and would not jump."

In rebuttal, the appellant testified in his own behalf: "I was the owner of the gray horse; it was not breachy, and would not jump over a four-rail fence; during that same season there were three gray horses run in that. pasture.

"And this was all the evidence given in the cause."

Upon this evidence the appellant's counsel make the point, that the "appellee averred in his complaint, that the Evansville and Crawfordsville Railroad Company was the owner of, and then operating, the railroad on which his mare was killed, and that its cars and locomotives ran against and upon said mare."

In discussing this point in this court, the appellant's counsel say, "That this allegation was material will not be questioned. *The Toledo, etc., R. W. Co.* v. *Weaver*, 34 Ind. 298. We insist, that, to make out his case, it was the plaintiff's duty to prove these allegations by a preponderance of the evidence."

It can not be doubted, we think, that the allegation referred to by counsel was material, and ought to have been sustained by a fair preponderance of the evidence.

In this court the rule is, that it must appear from the record, that evidence tending to. sustain each material averment of the pleading was adduced upon the trial of the cause. We do not weigh evidence as do the triers of the facts; and therefore the question of the preponderance of evidence is rarely, if ever, considered by this court.

In the case at bar, there was no direct or positive evidence adduced upon the trial, that the appellant was the owner of, or operated, the railroad upon which the appellee's mare was run over and killed. The evidence showed that the mare was run over and killed on the Evansville and Crawfordsville Railroad. The appellant, The Evansville and Crawfordsville Railroad Company, was sued for the killing of said mare on its railroad, and appeared to, and was there before the jury defending, the action. There was not a particle of evidence adduced upon the trial, tending to show that the railroad in question was owned or operated by any other person or corporation than the appellant; but it seems to have been assumed and taken for granted, as a fact about which no evidence was

needed, that the railroad was owned and operated by the appellant at the time the appellee's mare was run over and killed thereon. Under such circumstances and the evidence on the trial, it seems to us, that the jury trying the cause might have fairly and reasonably inferred and found, that the appellant owned and operated the railroad in question at the time the appellee's mare was killed thereon; and especially so, in the absence of any evidence whatever from which it could possibly be inferred that such railroad was owned or operated by any other person or corporation than the appellant. We think, therefore, that we ought not to disturb the verdict of the jury in this case for the want of direct and positive evidence in support of the averment in the complaint, that the appellant owned and operated said railroad at the time the appellee's mare was run over and killed thereon. In other words, as to this point, it seems to us, that the verdict of the jury in this case was sustained by sufficient evidence, and was not contrary to law.

One other point is made by the appellant's attorneys in this court, and is thus stated in their brief of this cause:

"We also insist, that the evidence did not warrant the jury in finding for the plaintiff, for another reason: The complaint avers, that the mare was killed at a point where the railroad was not securely fenced in. The evidence on this point is conflicting, and we think it fails to sustain the allegation."

In such a case, it is the province of the jury to reconcile the conflict, or to determine which of the witnesses are the more worthy of belief. For these purposes the jury have facilities which we, as an appellate court, can not have; and for this reason it has long been held by this court, that the verdict of a jury would not be disturbed solely on account of a conflict in the evidence. If there is any evidence in the record, as there was in this case, tending to sustain the verdict of the jury, it will be sustained, as a general rule, without regard to any

conflict in the evidence. This rule is so well established, and so well understood, that we need not cite authorities in its support.

In our opinion, no error was committed by the court below in overruling the appellant's motion for a new trial.

The judgment is affirmed, at the appellant's costs.